IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


TINA MICHELLE MCNEELY,

     **Plaintiff,**

v.                                 Civil Action No. 2:13-cv-00767

CAROLYN COLVIN,
ACTING COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,

     **Defendant.**


## PROPOSED FINDINGS AND RECOMMENDATIONS

This is an action seeking review of the final decision of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings (ECF No. 11) and Brief in Support of the Defendant's Decision (ECF No. 12).

Claimant, Tina Michelle McNeely, filed her application on June 11, 2010.  In her application, Claimant alleged disability beginning April 3, 2010.  The claim was denied initially on November 3, 2010, and upon reconsideration on December 15, 2010.  Thereafter, Claimant filed a timely written request for a hearing on January 18, 2011.  A hearing was held on August 29, 2011, in Huntington, West Virginia.  On October 6, 2011, the Administrative Law Judge (ALJ) determined that Claimant was not under a disability as defined in the Social Security Act,

therefore she was not entitled to benefits. On November 16, 2011, Claimant sought review of the ALJ's decision by the Appeals Council. On December 4, 2012, the Appeals Council denied further review. Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520, 416.920 (2013). If an individual is found "not disabled" at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. *Id.* If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other

2

forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2013).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date (Tr. at 18).  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of obesity, major depressive disorder, personality disorder, bipolar disorder with psychotic features, generalized anxiety disorder, panic disorder and obsessive-compulsive disorder (Tr. at 18).  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix. (*Id.*)  The ALJ then found that Claimant has a residual functional capacity ("RFC") "to perform a full range of work at all exertional levels", reduced by nonexertional limitations[1] (Tr. at 20).  As a result, Claimant cannot return to her past relevant work (Tr. at 23).  Nevertheless, the ALJ concluded that Claimant could perform jobs such as heavy level materials handler, day laborer, hotel or office cleaner, kitchen helper, product inspector and machine monitor (Tr. at 24).  On this basis, benefits were denied.

---

[1] Claimant is limited to understanding, remembering and carrying out simple and detailed instructions.  Claimant can only work in a low-stress job (defined as a job that requires only occasional decision making and has only occasional changes in the work setting), have no interaction with the public and only occasionally interact with co-workers (Tr. at 20).

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In *Blalock v. Richardson*, substantial evidence was defined as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational. *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner does not adequately weigh the evidence of the medical opinions on the record and base the decision on consideration of the entire record.

Claimant's Background

Claimant was born on October 21, 1974 (Tr. at 170). Claimant graduated high school and obtained specialized training to become a pharmacy technician (Tr. at 240). Claimant previously worked as a pharmacy technician for approximately 15 years (Tr. at 156). Claimant stopped working on April 3, 2010. Claimant is married with two children.

4

<u>The Medical Record</u>

Claimant was admitted to River Park Hospital on May 16, 2005, and discharged on May 20, 2005 (Tr. at 289-294).  David J. Humphreys was Claimant's attending physician.  Claimant's Discharge Summary was completed by Scott Mitchell, M.D. (Tr. at 294).  Claimant's admitting diagnosis included major depression, anxiety disorder and panic disorder with agoraphobia (Tr. at 289).  Claimant self-reported to be 30 years old at the time of admission experiencing suicidal ideation.  Claimant stated that 2 ½ years prior to the birth of her child, she was "okay."  Claimant stated that after the birth of this child, she progressively became more depressed.  (*Id.*)  Upon physical examination, Claimant's height was reported as 5'4" and weight was 170 pounds.  Upon review, impressions of Claimant included depressive disorder, anxiety disorder, questionable panic disorder with agoraphobia and endometriosis (Tr. at 290).  Throughout the course of hospitalization, Claimant attended individual and group therapies, as well as recreational groups and unit activities.  Prior to discharge, Claimant's affect was reported as "brighter" (Tr. at 290).  Claimant was reported as "calmer and pleasant."  Claimant's Discharge Summary stated she was not psychotic and was of no danger to herself or others (Tr. at 290-291).

Claimant was seen by April Baisden, M.D., of Valley Health Systems, on January 1, 2010, due to chief complaint of experiencing anxiety (Tr. at 216).  Claimant self-reported feeling like everything was closing in on her, irritability, worrying all the time, trouble sleeping and tension.  Claimant denied any depressive symptoms, hallucinations, nightmares or flashbacks.  Claimant reported to previously taking the prescription Paxil, which caused a discontinuation syndrome for which she had to be hospitalized.  (*Id.*)  Upon mental status examination, Dr. Baisden found Claimant's thought process was logical and linear; mood was good; affect was broad and reactive; and hallucinations, delusions, suicidal or homicidal ideation were not

present.   Claimant was awake, alert and oriented.   Her insight and judgment were fair.   Her attention and concentration were intact.   Her memory was intact to recent, remote and immediate events.   Claimant had a good fund of knowledge.   Claimant's gait and tone were normal.   Her impulse control was good and she had positive abstract thinking (Tr. at 217).

Claimant saw Dr. Baisden on February 17, 2010, as a follow-up appointment.   Claimant reported continuing trouble with anxiety.   Claimant's mental status examination was not different from her previous appointment with Dr. Baisden on January 1, 2010 (Tr. at 214).   Dr. Baisden assessed Claimant as experiencing generalized anxiety disorder and questionable obsessive compulsive disorder.   Claimant saw Dr. Baisden on March 23, 2010 (Tr. at 212).   Claimant reported increased stress at work due to a new boss allegedly questioning her about what medication she takes.   (Id.)   Claimant's mental status examination was not different from her previous appointment with Dr. Baisden on January 1, 2010 (Tr. at 214).

Claimant was admitted to New Hanover Regional Medical Center (hereafter, New Hanover) in Wilmington, North Carolina on April 7, 2010 (Tr. at 187).   Claimant was admitted after her attempted suicide by taking approximately 90 Klonopin 0.5 mg tablets which she described as her 4th suicide attempt (Tr. at 187).   Claimant reported to difficulties sleeping and experiencing suicidal ideations.   Claimant reported her primary care physician to be Dr. Sherry Harper of Barboursville, West Virginia (Tr. at 188).   Claimant was discharged from New Hanover on April 16, 2010, by attending physician Patrick D. Martin, M.D. (Tr. at 183).   Dr. Martin noted Claimant's suicidal resolve at the time of admission was inconsistent due to the fact that "her belongings included a half filled bottle of Klonopin 0.5 mg tablets which she apparently had not taken."   (Id.)   Dr. Martin noted Claimant's "degree of somnolence was moderate, but certainly not severe enough to require general medical support on the medical service prior to

6

transfer to psychiatry." (*Id.*) "The physical assessment performed upon arrival at New Hanover yielded no evidence of medical or neurologic abnormality which might have contributed to her psychiatric hospitalization."   After admission, Dr. Martin noted Claimant's "most striking clinical feature was the degree to which [she] was histrionic and solicitous of inappropriate caretaking from staff." (*Id.*)

Dr. Martin's Discharge Summary from New Hanover stated Claimant could resume her pre-hospitalization activities, regular diet and oral medication.  "Social Services investigated the availability of a partial hospitalization program or intensive outpatient program, but were told that her insurance would not cover such a program and [Claimant] indicates that she does not wish referral to any program which her insurance would not cover due to her lack of ability to pay without insurance support" (Tr. at 185).  Dr. Martin stated Claimant "may resume full-time employment, oral medications, her regular diet and routine activities upon discharge."

Claimant was seen by Dr. Baisden on April 20, 2010, for a follow-up appointment (Tr. at 209).  Claimant reported to only sleeping an hour or two a day.  Claimant reported to getting up for work but driving herself to the beach where she attempted to overdose on the prescription medication, Klonopin.  Claimant was hospitalized for approximately 2 weeks at The Oaks in North Carolina.  Claimant reported to feeling very nervous and having very vivid dreams. Claimant stated she is "currently off work."  Claimant reported to wanting to "try to return to work soon, but with the difficulty concentrating and focusing and the stress currently going on at work, it seems like that it is not really viable right now."  Upon mental status examination, Claimant expressed depressed mood; dysphoric, reactive and appropriate affect;  no hallucinations or delusions; good insight and judgment; impaired memory of recent events; no suicidal or homicidal ideation; and a logical and linear thought process (Tr. at 209).

During a follow-up appointment with Dr. Baisden on May 29, 2010, Claimant reported to "doing better" (Tr. at 206). Claimant reported to experiencing decreased anxiety, sleeping well and desiring to return to work. Claimant reported she had talked to her boss and felt like they had come to an understanding, although she claimed they still did not get along very well. (*Id.*) Claimant's mental status examination was not different from her previous appointment with Dr. Baisden on January 1, 2010 (Tr. at 214). Dr. Baisden's Plan included Claimant returning to work on a part-time basis.

Claimant filed for DIB on June 11, 2010, asserting an alleged onset date of April 3, 2010 (Tr. at 139). Claimant's self-reported Social Security Administration Function Report lists her conditions as inability to concentrate and be around a lot of people and experiencing anxiety (Tr. at 154). Claimant listed her daily activities to include taking a shower, cleaning the house, watching her children and cooking dinner (Tr. at 155). Claimant reported to taking care of her husband and getting him ready for work. Claimant reported to difficulty falling asleep. As for preparing meals, Claimant reported to preparing breakfast, lunch and dinner on a daily basis (Tr. at 156). She stated it takes her a couple hours to prepare some of the meals. Claimant reported to performing household chores, such as laundry, a couple days a week. (Id.) Claimant leaves her home a couple days a week, but gets nervous when going out alone (Tr. at 157). She reported that she drives a car and shops for food and clothing for the children a couple days a week for 2 hours at a time. Claimant reported to being able to pay bills, count change and use a checkbook/money order(s). Claimant reported that she is not involved in social activities, but does attend church on a regular basis (Tr. at 158). Claimant reported that she cannot follow spoken instructions very well (Tr. at 159). Although Claimant reported not handling job stress very well, that she gets along with authority figures "just fine" (Tr. at 160). Claimant reported

that she has not been fired or laid off from a job because of problems getting along with other people.

On June 17, 2010, Claimant was admitted to Mildred Mitchell Bateman Hospital until discharge on June 23, 2010 (Tr. at 225).   Claimant was admitted due to a suicide attempt. Claimant self-reported to recent hospitalization in April 2010, in North Carolina for 15 days. Claimant stated that she felt suicidal and attempted to cut her wrist.  (*Id.*)  Claimant reported to feeling hopeless and helpless.  On June 23, 2010, Claimant was discharged and transferred to Prestera in Huntington, West Virginia (Tr. at 226).

On July 22, 2010, Claimant was admitted to River Park Hospital[2] (Tr. at 282).   River Park Hospital's Discharge Summary dated July 26, 2010, reflect that Claimant admitted "homicidal ideation towards her ex-CEO at Health South" (Tr. at 282).   Claimant reportedly made a verbal comment about wanting to kill her ex-boss because she was upset with how she had been treated.  Claimant complained of job stress beginning October 2009, when a pharmacist she worked with was caught diverting drugs and Claimant told her supervisors.  (*Id.*)  The Discharge Summary reported that Claimant left work impulsively in April 2010, and drove to Myrtle Beach, South Carolina after an argument with her boss.  Claimant reported at discharge that she was ready to return home and "wanted to stay  home and take care of her children since her husband could support them financially" (Tr. at 284). At the time of discharge, Claimant was stable on medications without adverse side effects.   Her mood and anxiety symptoms were improved.  Claimant's mood was stable.  (*Id.*)

---

[2] Claimant was admitted to River Park Hospital as a Mildred Mitchel Bateman Hospital overflow patient.

Claimant's social worker, Joyce B. Perry, MA, LPC, LSW, with Professional Counseling and Consulting Services noted on July 27, 2009, that Claimant reported she loves her job at Health South, but her other responsibilities keep her busy and fatigued (Tr. at 314).  Ms. Perry's Progress Notes state that Claimant self-reported symptoms of crying, insomnia, feeling out of control and the desire to avoid the public except for at work.  (*Id.*)  Claimant saw Ms. Perry again on August 10, 2009, and August 25, 2009 (Tr. at 313).  Claimant reported to feeling frustrated due to lack of sleep.  Claimant saw Ms. Perry on September 3, 2009, and September 17, 2009 (Tr. at 312).  Claimant reported to picking at the skin on her feet.  Ms. Perry referred Claimant to a primary care physician to treat her foot.

Claimant saw Ms. Perry on September 30, 2009, October 14, 2009, and October 28, 2009 (Tr. at 310-311).  Claimant reported to being upset at work due to reporting a friend and the friend being fired.  Following the termination of Claimant's friend at work, Claimant reported to feeling "much better now" (Tr. at 310).  Claimant said she was doing well and had "weathered it all fine."  (*Id.*)  Ms. Perry's Progress Notes reflected that Claimant's mood had improved. Claimant saw Ms. Perry on January 5, 2010, and February 23, 2010 (Tr. at 308-310).  Claimant reported irritability and anxiety due to stress from work and "active young children" (Tr. at 309). Claimant reported not getting enough rest at home (Tr. at 308).

On March 16, 2010, Claimant reported to Ms. Perry that she felt constantly scrutinized by the new pharmacist at her work (Tr. at 307).  Progress Notes dated April 19, 2010, after Claimant's attempted suicide at Myrtle Beach, South Carolina, report that Claimant stated she can't work at Health South anymore because the pressure makes her lose her concentration. Claimant stated that Dr. Martin, at New Hanover, thought that she is too risky to return work outside of her home due to her diagnosis and medications (Tr. at 304).  On April 26, 2010,

Claimant reported to getting baptized at church. Claimant reported hearing negative voices in her head. Claimant stated that her employer had pushed her to the point of trying to kill herself "by taking a whole bottle of meds" (Tr. at 305).

On May 11, 2010, and June 9, 2010, Claimant saw Ms. Perry (Tr. at 303-304). Ms. Perry's Progress Notes reflect Claimant stating that she would have no problem going to work part-time (Tr.at 304). Claimant stated "If I can do it, I'd really like that." (*Id.*) Ms. Perry noted that Claimant was receptive to the proposed benefits of returning to work.

Dr. Baisden reported to seeing Claimant for a follow-up appointment on June 11, 2010 (Tr. at 376). Dr. Baisden discussed Claimant allegedly threatening co-workers. Claimant stated that she said it out of frustration and in no way intended to harm anybody. (*Id.*) Dr. Baisden discussed with Claimant that it was inappropriate for her to say things like that. Dr. Baisden reported that Claimant seemed to recognize the inappropriateness. Claimant denied any suicidal or homicidal thoughts. Claimant reported "No more episodes of kind of losing her attention or being absent mentally." Claimant's speech was normal. Her thought process was logical and linear. Her mood was down. Her affect was dysphoric and reactive. Claimant was not experiencing hallucinations, delusions, suicidal or homicidal ideation. Her insight and judgment were fair. Claimant was awake, alert and oriented.

On June 16, 2010, Dr. Baisden sent a letter to the CEO of Health South regarding Claimant (Tr. at 373-374). Dr. Baisden wrote in response to a letter from the CEO dated June 3, 2010, that she could not confirm if Claimant was currently or would in the future, be of risk for physical harm to herself or others. Dr. Baisden stated that she could not predict future events and could only make a statement based on Claimant's current state when she was last seen. Dr.

11

Baisden wrote that on the given day of Claimant's last visit, June 11, 2010, Claimant was not homicidal or suicidal.  Dr. Baisden wrote that she had initially recommended that Claimant return to work for 20 hours per week, however, Claimant "said this was unacceptable according to the company's policies and that she would have to return to 32 hours a week" (Tr. at 373).  Accordingly, Dr. Baisden changed her recommendation to work 32 hours a week.

On July 1, 2010, Enid A. Kurtz, M.D., with Prestera, completed an Initial Psychiatric Evaluation of Claimant (Tr. at 361-366).  The Chief Complaint states that Claimant was referred by Mildred Mitchell Bateman Hospital "where she was committed [for] threatening suicide and homicide" (Tr. at 361).  Dr. Kurtz's session notes dated July 29, 2010, reflect that after Claimant was committed for making homicidal threats towards her former boss, the CEO of Health South, Claimant was committed by Prestera staff, her former boss was warned formally that threats against his life had been made and "a restraining order was effected" (Tr. at 363).

On July 21, 2010, and August 11, 2010, Progress Notes by Ms. Perry, MA, LPC, LSW, reflect that Claimant was attending group therapy at Prestera (Tr. at 303).  Claimant stated her medications are "doing better."  Ms. Perry noted Claimant to be up-beat about not being faced with social or occupational situations which created feelings of "not being able to cope or live."

A Progress Note by Dr. Baisden dated July 21, 2010, reported speaking with Michael O'Neil (Tr. at 375).  Mr. O'Neil called Dr. Baisden to report that Claimant had resigned from her position.  Mr. O'Neil reported that Prestera had notified Claimant's manager that she had made threats of wanting to get a gun and shoot him.  (*Id.*)  Prestera had also notified the State Police.  Dr. Baisden noted that she had not seen Claimant since June 2010, and was uncertain if Claimant

had changed providers.  Dr. Baisden reported that the "duty to warn had already been taken care of by providers at Prestera."  (*Id.*)

Ms. Perry completed a Routine Abstract Mental Form for the State of West Virginia's Disability Determination Section on August 2, 2010 (Tr. at 299-302).  Ms. Perry reported Claimant's treatment beginning on July 27, 2009, to July 21, 2010 (Tr. at 299).  Claimant's recent mental status was reported to include disorientation, normal speech, auditory hallucinations, moderate suicidal ideation, no homicidal ideation, moderately deficient judgment, restricted affect, depressed mood, perceptual déjà vu, moderately deficient insight, fear of failure and fear of the future (Tr. at 300). Claimant's functional capacities were reported to include moderately deficient immediate memory, severely deficient recent memory, mildly deficient social functioning, moderately deficient concentration, mildly deficient task persistence and moderately deficient pace (Tr. at 301).  Ms. Perry noted that Claimant's "Concentration, social interaction, memory and adaptation to a work environment seems very impaired, based on recent interviews/sessions" (Tr. at 302).

Jeff Boggess, Ph.D., performed a Psychiatric Review of Claimant on October 27, 2010 (Tr. at 316).  Dr. Boggess reported Claimant's medical disposition to reflect a severe impairment that was not expected to last 12 months.  (*Id.*)  Dr. Boggess found Claimant to suffer from Appendix 1 listings 12.04 Affective Disorder, Bipolar Syndrome manifested by both manic and depressive syndromes; 12.08 Personality Disorders, specifically a borderline personality disorder; and a 12.09 Substance Addiction Disorder involving benzodiazepine abuse (Tr. at 319, 323 and 324).  Dr. Boggess did not report evidence of any factors indicating Appendix 1 listings 12.02 Organic Mental Disorders; 12.03 Schizophrenic, Paranoid and Other Psychotic Disorders; 12.05 Mental Retardation; 12.06 Anxiety-Related Disorders; 12.07 Somatoform Disorders; and

12.10 Autistic Disorder and Other Pervasive Developmental Disorders.   Dr. Boggess rated Claimant's degree of functional limitations restricting activities of daily living as non-existing. Claimant's degree of functional limitation in maintaining social functioning and maintaining concentration, persistence or pace were rated as mild.   Claimant was reported to experiencing three episodes of decompensation, each of extended duration (Tr. at 326).

On November 1, 2010, Dr. Boggess' Case Analysis stated that the "Decision proposed is a durational denial" (Tr. at 330).   He reported that the limitations set forth in his October 27, 2010, Psychiatric Review "are reflective of limitations assumed after the durational denial period (12 months past initial alleged onset date)."   (*Id.*)   On December 13, 2010, Joseph A. Shaver, Ph.D., completed a Case Analysis affirming his review of all pertinent information in the case file and Dr. Boggess' assessment dated October 27, 2010 (Tr. at 336).   Dr. Shaver affirmed Dr. Boggess' Case Analysis.

Claimant was treated by Dr. Debra J. Stultz at the Stultz Sleep and Behavioral Health Sleep Lab (hereinafter, Sleep Lab) on April 1, 2011 (Tr. at 368-370).   Claimant was 37 years old at the time she sought treatment at the Sleep Lab.   Claimant self-reported to feeling nervous and anxious.   Claimant stated that she had been out of her medications for the previous 4 days. Claimant reported to feeling tired due to lack of sleep.   She reported that she gets up with her husband at 4:00 a.m. and with her kids at 6:00 a.m. (Tr. at 368).   Claimant was seen by Dr. Stultz again on May 4, 2011 (Tr. at 367).   Notes from the Sleep Lab session, on May 4, 2011, reflect that Claimant paid cash for the session.

On August 1, 2011, Dr. Stultz completed a Mental Assessment of Ability to do Work-Related Activities form regarding Claimant (Tr. at 378-380).   Dr. Stultz reported that Claimant's

abilities to follow work rules and maintain personal appearance were not limited.   Claimant's abilities to use judgment; function independently; and understand, remember and carry out simple job instructions were slightly limited.  Claimant's abilities to understand, remember and carry out detailed, but not complex job instructions; behave in an emotionally stable manner; and complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods were moderately limited.  Claimant's abilities to relate to co-workers, interact with supervisors; maintain attention/concentration; and relate predictably in social situations were rated as marked.[3]  Claimant's abilities to deal with the public; deal with work stresses and understand, remember and carry out complex job instructions were extremely[4] limited (Tr. at 379).  Dr. Stultz reported that Claimant did not possess the capability to manage benefits in her own best interest (Tr. at 380).  At the Administrative Hearing on August 29, 2011, Claimant testified experiencing stress at work and that her employer "wouldn't let [her] come back to work" (Tr. at 31).  Claimant testified to being unable to maintain a checkbook or pay bills due to stress (Tr. at 37).

<u>Claimant's Challenges to the Commissioner's Decision</u>

        Claimant asserts the Commissioner's decision erred in rejecting the opinion of Dr. Stultz, who Claimant asserts is her mental health provider.   Claimant avers the Commissioner committed reversible error in according little weight to the opinion of Claimant's licensed social worker, Joyce B. Perry, MA, LPC, LSW.  Claimant argues that substantial evidence of record documents reflect that Claimant is disabled and unable to perform the basic mental demands of

---

[3] Marked is defined on the Mental Assessment of Ability to do Work-Related Activities form to include serious limitation in an area: "The ability to function is severely limited" (Tr. at 378).
[4] Extreme is defined on the Mental Assessment of Ability to do Work-Related Activities form to include major limitation in an area: "There is no useful ability to function in this area" (Tr. at 378).

unskilled work, warranting an award of benefits. The Commissioner asserts that there was substantial evidence in the record to support the ALJ's decision to give little weight to the opinion of Dr. Stultz and give reduced weight to the opinion of Ms. Perry. The Commissioner argues that substantial evidence in the record supports the ALJ's decision that Claimant is not disabled and the ALJ employed the correct legal standard(s) in reaching the decision.

Treating Physician Analysis

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(d)(2) (2013). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also*, 20 C.F.R. § 404.1527(d)(2) (2013). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2) (2013). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact and resolve conflicts of evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527. These factors include: (1) Length of the

treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  *Id.* § 404.1527(d)(2).

Claimant alleges a disability onset date of April 3, 2010.  Claimant asserts that Dr. Stultz, of Stultz Sleep and Behavioral Health R.E.S.T. Sleep Lab, is her treating mental health physician.  Evidence submitted on the record demonstrates that Claimant was initially seen by Dr. Stultz, one year after the alleged disability onset date, on April 1, 2011 (Tr. at 368-370). Claimant was seen again by Dr. Stultz on May 4, 2011 (Tr. at 367).  Dr. Stultz completed a Mental Assessment of Ability to do Work-Related Activities form on August 1, 2011 (Tr. at 378-380).

Dr. Baisden is a psychiatrist who has treated Claimant since she was referred by her social worker, Ms. Perry, in January 2010 (Tr. at 216).  Claimant was referred to Dr. Baisden "for evaluation of her anxiety."  (*Id.*)    Evidence submitted on the record demonstrates that Dr. Baisden treated Claimant from January 1, 2010, to June 2010.  However, the ALJ did not address weight given to Dr. Baisden's treatment of Claimant.  The length, consistency, supportability, specialization and extent of Claimant's treatment relationship with Dr. Baisden were not addressed by the ALJ.

The ALJ found that Dr. Stultz did not support her statements with any form of testing; she only made the statements based on Claimant's allegations and perceived presentation (Tr. at 22).  The ALJ gave Dr. Stultz's assessment little weight.  As previously stated, the opinion of a treating physician must be weighed against the record as a whole when determining eligibility

for benefits.  20 C.F.R. §§ 404.1527(d)(2) (2013).  The ALJ did not factor in length, consistency, supportability, specialization and extent of Dr. Stultz's opinion.  Furthermore, the ALJ did not address the weight given to the analysis by non-treating physicians Dr. Boggess and Dr. Shaver, and examining physicians Dr. Humphreys, Dr. Martin and Dr. Kurtz.

This Court's review of the ALJ's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the ALJ and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *See*, *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). The ALJ failed to give adequate weight to the medical opinions presented by the doctors or offered as evidence.  Additionally, this Court finds that the ALJ's decision was not based on consideration of the entire record.

The Court recommends remand in this case because of the ALJ's failure to adequately weigh the evidence of the medical opinions on the record and base the decision on consideration of the entire record. As such, this Court need not address Claimant's additional arguments that the ALJ committed reversible error in according little weight to the opinion of Claimant's licensed social worker and that substantial evidence demonstrates that Claimant is disabled (ECF No. 11).

Conclusion

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the District Court DENY Plaintiff's Complaint and Brief in Support of Judgment on the Pleadings, DENY Defendant's Brief in Support of the Defendant's Decision, REVERSE the final decision

of the Commissioner, REMAND this case for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g), and DISMISS this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable John T. Copenhaver, Jr.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Copenhaver and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Enter:  February 28, 2014.

Dwane L. Tinsley
United States Magistrate Judge