UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


TINA MICHELLE MCNEELY,

         Plaintiff,

v.                                    Civil Action No.: 2:13-767

CAROLYN W. COLVIN,
Acting Commissioner,
Social Security Administration,

         Defendant.


MEMORANDUM OPINION AND ORDER

        This action was previously referred to the Honorable

Dwane L. Tinsley, United States Magistrate Judge, for submission

to this court of proposed findings of fact and recommendation

for disposition ("PF&R"), pursuant to 28 U.S.C. § 636(b)(1)(B).

The magistrate judge submitted his PF&R on February 28, 2014.

In it, he recommends that the court reverse the Commissioner's

final decision and remand this matter for further proceedings

pursuant to the fourth sentence of 42 U.S.C. § 405(g).  The

Commissioner timely filed objections to the PF&R on March 17,

2014.

## I. Background

On June 17, 2010, the plaintiff, Tina Michelle McNeely ("McNeely"), filed an application for disability insurance benefits under Title II of the Social Security Act.  Record ("R.") at 109-17.  She alleged that she was suffering from bi-polar disorder, manic depression, anxiety, and disassociation disorder with an alleged onset date of April 3, 2010.  R. at 130-31, 139.  McNeely's application was initially denied on November 3, 2010, R. at 46-50, and denied a second time upon reconsideration on December 15, 2010, R. at 52-54.  She requested a hearing before an Administrative Law Judge ("ALJ"), which was conducted on August 29, 2011.  R. at 25-41.  On October 6, 2011, the ALJ issued a decision finding that McNeely was not disabled.  R. at 24 ("The claimant has not been under a disability, as defined in the Social Security Act, from April 3, 2010, through the date of this decision[.]").  The Appeals Council thereafter denied McNeely's request for review, rendering the ALJ's denial of benefits the official position of the Commissioner.  R. at 1-3.  On January 15, 2013, McNeely instituted this action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

2

A. The Record Evidence[1]

McNeely is a thirty-nine-year-old woman who resides in Lincoln County, West Virginia. She is married and has two children. McNeely reports that she has had mental health problems "on and off throughout her life," R. at 31, an allegation which is supported by an extensive medical history of psychiatric treatment and hospitalization.

1. McNeely's Inpatient Treatment Records

The record indicates that the plaintiff has been admitted for inpatient psychiatric care on at least five occasions. In May 2005, she was admitted to Riverpark Hospital ("Riverpark") in Huntington, West Virginia, and diagnosed with severe, recurrent, major depression; anxiety disorder; and panic disorder with agoraphobia. R. at 289-91.

Medical records indicate that McNeely was then admitted to the Prestera Mental Health Center ("Prestera") on September 24, 2009, complaining of "frequent sadness, worry,

_____

[1] The plaintiff's background and relevant medical history is thoroughly recited in the PF&R, and only briefly summarized and supplemented here.

poor concentration, irritability, frequent night awakenings, increased appetite, and loss of interest in activities," among other symptoms.  R. at 228-38.  Her treatment records from Prestera indicate a diagnosis of major depressive disorder, panic disorder, and generalized anxiety disorder.  R. at 241.

On April 7, 2010, McNeely was admitted to the New Hanover Regional Medical Center ("New Hanover") in Wilmington, North Carolina, after overdosing on Klonopin in an attempt to commit suicide.  R. at 183.  Admission notes compiled by Dr. Patrick D. Martin indicate that her treating physicians were "impressed with her suicidal resolve," despite the fact that a half-filled bottle of Klonopin tablets was found in McNeely's possession.  Id.  During the course of her ten-day hospitalization, McNeely was "histrionic and solicitous of inappropriate caretaking," and "made little effort to provide information or to even interact with staff initially."  R. at 183-84.  She "continued to voice active suicidal ideation until the final [forty-eight] hours" of her admission, and was not cleared for discharge until the final twenty-four hours of her admission.  R. at 184.  McNeely was diagnosed with major depressive disorder, depression associated with underlying cluster B character pathology, and borderline personality

4

disorder.  Dr. Martin indicated that McNeely also exhibited "significant obsessive-compulsive and trichotillomanic symptoms" that were "probably neurochemical in [] origin."  R. at 185. Her prognosis for sustained improvement was characterized as "guarded at best," but she was cleared to resume full-time employment and her regular routine activities upon discharge. R. at 184-85.

McNeely was next admitted to Mildred Mitchell Bateman Hospital in Huntington, West Virginia, for a seven-day course of hospitalization beginning on June 17, 2010 after stating that "she felt suicidal and attempted to cut her wrist."  R. at 225. She was "extremely depressed" upon admission and complained of nonspecific auditory hallucinations.  R. at 226.  The following morning, the plaintiff "became extremely angry and agitated" and "had to be placed in restraints."  Id.  McNeely made "significant improvement" during her stay, but her discharge diagnoses included major, severe, and recurrent depression with psychotic features; anxiety disorder; borderline personality disorder traits; and "problems with social environment, occupational problems."  R. at 225.

Just over one month later, on July 22, 2010, McNeely was involuntarily admitted to Riverpark for five days after

5

making "a verbal comment about wanting to kill her ex-boss."  R.
at 282.  She later indicated that "was never serious when she
made this comment," and expressed a desire to return home.  R.
at 282-83.  She was stable upon discharge on July 26, 2010, but
again diagnosed with major depressive disorder and impulse
control disorder.  R. at 283.

### 2. McNeely's Outpatient Treatment Records

        In addition to the episodes of inpatient psychiatric
treatment described above, the medical record also indicates
that McNeely received outpatient mental health treatment from a
number of sources.

        The plaintiff was treated by Joyce Perry, a licensed
social worker and licensed professional counselor, on a regular
basis from July 2009 until at least August 2010.  R. at 300-14.
Ms. Perry's treatment notes provide a detailed longitudinal
overview of McNeely's mood and symptoms.  Ms. Perry's notes
indicate that the plaintiff reported, at various times, feeling
anxious, out of control, and fatigued, and also reported
auditory hallucinations.  Id.  The severity of these symptoms
appears to have fluctuated over time, at least in part in

response to stress that McNeely experienced at home and at work. For example, in the autumn of 2009 McNeely described being upset after reporting a co-worker at the pharmacy where she worked for diverting drugs.  R. at 310.  The plaintiff also indicated to Ms. Perry that she felt constantly scrutinized at work in the months preceding her April 2010 suicide attempt.  R. at 305-06. Thereafter, Ms. Perry's notes indicate that McNeely "bec[ame] very shaky [and] crie[d] uncontrollably when describing her place of employment."  R. at 305.

On August 2, 2010, Ms. Perry completed a mental health assessment in which she indicated that McNeely was, by that time, experiencing moderate auditory hallucinations and suicidal ideation, was possessed of moderately deficient judgment and insight, and was suffering from depressed mood.  R. at 300.  Ms. Perry rated McNeely's immediate memory as moderately deficient; her recent memory as severely deficient; her concentration and pace as moderately deficient; and her task persistence and social functioning as mildly deficient.  R. at 301.  She further observed that McNeely's "concentration, social interaction, memory, and adaptation to a work environment seem[ed] very impaired, based on recent interviews/sessions."  Id.

During the course of treatment, Ms. Perry referred McNeely to a psychiatrist, Dr. April Baisden, on January 12, 2010, and McNeely thereafter saw Dr. Baisden on a monthly basis until at least June 2010.  R. at 205-22.  Dr. Baisden initially observed that McNeely exhibited signs of anxiety disorder and obsessive compulsive disorder, but rated her thought processes as "logical and linear"; her memory as "intact [as] to recent, remote[,] and immediate events"; her tone and gate as normal; and her impulse control as good.  R. at 217.  Subsequent treatment notes indicate that McNeely's symptoms improved with medication, despite increased stress at work.  R. at 212. Following the plaintiff's suicide attempt in April 2010, Dr. Baisden indicated that McNeely reported "doing somewhat better" and expressed an interest in returning to work, although McNeely was concerned that doing so was "not viable" due to "difficulty concentrating and focusing."  R. at 209.

On May 21, 2010, Dr. Baisden noted that McNeely was improving and indicated that plaintiff could return to work on a part-time basis.  R. at 206.  However, Dr. Baisden's final treatment notes from June 11, 2010 reflect that when McNeely did return to work, she thereafter made threatening comments to her coworkers, R. at 376.  McNeely reported to Dr. Baisden that

these threats were made out of frustration and not serious.  Id.
Nevertheless, on June 16, 2010, Dr. Baisden wrote to McNeely's
employer in response to concerns over the plaintiff's
threatening behavior towards co-workers, and stated that she was
"unwilling at [that] point to state with certainty that
[McNeely] could not be a risk to herself or . . . to someone
else[.]" R. at 373-74.

Dr. Baisden's final diagnostic notes indicated that
McNeely was suffering from anxiety disorder, dissociative
disorder, and questionable bipolar disorder. R. at 376.  She
rated the plaintiff's insight and judgment as fair, her thought
process as logical and linear, but noted that McNeely was
"tearful when she talk[ed] about . . . work" and was "clearly
upset by it." Id.  Indeed, a final progress note dated July 21,
2010 indicates that McNeely had resigned from her job after
threatening to "get a gun [and] shoot" a coworker.  R. at 375.

Finally, McNeely also sought treatment from Dr. Debra
Stultz, a psychiatrist, in April and May of 2011.  McNeely may
have had a longer treatment relationship with Dr. Stultz, as her
September 2009 admission record from Prestera stated that, at
that time, McNeely had received outpatient treatment from Dr.

Stultz for "several months," possibly as early as 2005.  R. at 238.

Dr. Stultz's treatment notes from April 2011 indicate that McNeely had been out of medication for four days, was compulsively picking at her skin, having hallucinations, and feeling nervous, anxious, and paranoid.  R. at 368.  Records from that visit also indicate diagnoses of bipolar disorder, depression with psychotic features, panic disorder, and obsessive compulsive disorder.  R. at 370.  Dr. Stultz's notes from May 4, 2011 state that the plaintiff was continuing to suffer from paranoia, mood swings, and irritability, but was no longer experiencing hallucinations.  R. at 367.

On August 1, 2011, Dr. Stultz completed a Mental Assessment of Ability to do Work Related Activities on McNeely's behalf.  In it, she reported that McNeely's:

- ability to follow work rules and maintain personal appearance was not limited;
- her ability to use judgment, function independently, and understand, remember, and carry out simple job instructions was slightly limited;
- her ability to understand, remember, and carry out detailed but not complex job instructions, behave in an emotionally stable manner, complete a normal work week without interruption from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods was moderately limited;
- her ability to relate to co-workers, interact with supervisors, maintain attention/concentration, and relate

10

predictably in social situations was marked[i.e., severely limited]; and

- her ability to deal with the public, deal with work stresses, and understand, remember, and carry out complex job instructions was extremely limited.

R. at 378-80.  Dr. Stultz also opined that McNeely did not possess the capability to manage benefits in her own best interest.  Id.


### 3. State Consultant Assessments of McNeely


On October 27, 2010, Jeff Boggess, Ph.D., a consultant for the State, performed a "Psychiatric Review Technique" assessment.  R. at 316-35.  In it, he opined that the plaintiff suffered from affective disorder, personality disorder, and a substance addiction disorder, but ultimately concluded that McNeely's impairments, while severe, were not expected to last for twelve months.  R. at 316.  Although Dr. Boggess noted that the plaintiff had experienced three episodes of extended decompensation, he indicated that McNeely did not have any functional limitation on her ability to engage in activities of daily living, and opined that she had only mild difficulty maintaining social function, concentration, persistence, or pace.  R. at 326.  In the section of the review form titled "Consultant's Notes," Dr. Boggess took note of McNeely's

"numerous" mental health diagnoses, but suggested that the plaintiff would "likely improve with continued [treatment] and compliance with mood stabilizing medications." R. at 328.

Thereafter, on December 13, 2010, Joseph Shaver, Ph.D., "reviewed all pertinent information in [the] case file and" affirmed Dr. Boggess's assessment "as written." R. at 336.

### 4. The Administrative Hearing

The ALJ conducted an administrative hearing on August 29, 2011. McNeely testified to having lifelong difficulties with her mental health, but specifically noted that she went "into a downhill spiral" in April 2010 when she "got a new boss at work[.]" R. at 31. She stated that she began suffering from panic or anxiety attacks several times per day at that time, and that these episodes required her to leave work in order to calm herself. Id. The plaintiff also testified regarding her current mental status, stating that she was suffering from major depression with psychotic features, and that she had auditory and visual hallucinations throughout the day, even when medicated. R. at 32. She reported that she was anxious and paranoid, "very afraid to leave [her] house," and generally

concerned that "people [were] there to get [her]."  R. at 34-35.

McNeely also testified that she experienced episodes of stress-induced disassociation that caused her to lose her memory and ability to concentrate for periods of one-to-two days "[a]t least once a month," and that she suffered from panic attacks on a weekly basis.  R. at 35-36.

Leah Salyers, a vocational expert, also testified at the hearing.  The relevant portions of the ALJ's colloquy with Ms. Salyers are as follows:

> Q If you were to assume a hypothetical individual of the claimant's age, education and work experience who has no exertional limitations, can understand, remember and carry out simple and detailed instructions, can only work in a low stress job, which is defined as one that has only occasional decision making required and has only occasional changes in the work setting and the individual can have no interaction with the public and only occasional interaction with coworkers.  Can an individual with those limitations perform any of the claimant's past work?
> A No, sir.
> Q And are there any unskilled jobs such an individual could perform?
> A Yes, your Honor.
> *    *    *
> Q All right Ms. Salyers.  If you'd also assume that the individual can have only non-confrontational interaction with supervisors, [in] addition to limitations from the first hypothetical[, c]ould that change the jobs or number cited?
> A Your Honor, non-confrontational contact is difficult for me to assess in terms of being something on a highly individualized, specialized basis, and for that

reason to totally eliminate that possibility would
eliminate all jobs.
Q Okay.  And then the last hypothetical I have for you
is based upon the medical source statements provided
by Dr. Stultz . . . . Now, if those limitations were
given great weight, would past work be precluded?
A Yes, it would.
Q And are there any jobs that such an individual could
perform?
A No, sir.

R. at 38-40.


B. The ALJ's Decision


The evidence contained in the administrative record in

this case depicts a woman suffering from several diagnosed

mental health conditions, struggling to cope with the stresses

of her domestic and professional life over the course of several

years, often with limited success.  The question for the ALJ to

decide was whether McNeely's condition was so severe that it

rendered her disabled within the meaning of Title II of the

Social Security Act.

In doing so, he was required to follow a sequential,

five-step process.  See 20 C.F.R. § 404.1520.  Specifically,

"[a]n ALJ must consider whether a claimant (1) is working, (2)

has a severe impairment, (3) has an impairment that meets or

equals the requirements of a listed impairment, (4) can return

14

to her past work, and (5) if not, whether the claimant retains
the capacity to perform specific jobs that exist in significant
numbers in the national economy.  The burden of proof and
production rests on the claimant during the first four steps,
but shifts to the Commissioner on the fifth step." Burch v.
Apfel, 9 F. App'x 255, 257 (4th Cir. 2001) (citing Pass v.
Chater, 65 F.3d 1200, 1203 (4th Cir. 1995)).

     On October 6, 2010, the ALJ issued a decision denying
McNeely's request for benefits.  R. at 13-24.  At steps one and
two, the ALJ determined that McNeely had not engaged in
substantial gainful activity since April 3, 2010 as the result
of several severe impairments, including: "obesity; major
depressive disorder; personality disorder; bipolar disorder with
psychotic features; generalized anxiety disorder; panic
disorder; and obsessive-compulsive disorder."  R. at 18.  At
step three, the ALJ concluded that McNeely did not suffer from
an impairment listed in 20 C.F.R. § 404, Subpt. P, App. 1.  R.
at 18.  However, he noted that she had: mild restrictions on her
ability to carry out daily living activities; moderate
difficulties functioning socially; and moderate difficulties
with regard to concentration, persistence, or pace.  R. at 19-
20.  The ALJ further observed that McNeely had experienced "one

15

to two episodes of decompensation, each of extended duration."
R. at 20.

Next, the ALJ determined that the plaintiff had the
residual functional capacity ("RFC") to:

> perform a full range of work at all exertional
> levels[,] with the following limitations: [1] she can
> understand, remember, and carry out simple and
> detailed instructions; [2] [she] can only work in a
> low-stress job (defined as a job that requires only
> occasional decision making and has only occasional
> change in the work setting); [and] [3] [she] can have
> no interaction with the public and occasional
> interaction with co-workers.

R. at 20.   The ALJ concluded that McNeely retained the
aforementioned RFC at least in part because he found that the
plaintiff's "statements concerning the intensity, persistence[,]
and limiting effects of [her] symptoms" to the contrary "[we]re
not credible[.]"

In reaching his credibility determination, the ALJ
weighed the consistency of McNeely's testimony against several
pieces of record evidence.   For example, the ALJ noted that,
although McNeely alleged that her panic attacks prevented her
from leaving the house except under certain circumstances,
"treatment records from Valley Health Systems" showed that the
plaintiff's symptoms improved with medication.   R. at 22.   The
ALJ also noted that while McNeely had been "hospitalized a few

16

times for mental impairments," her stays were "of short duration
and her symptoms improved."  R. at 22.  Specifically, the ALJ
observed that "[u]pon release from New Haven [*sic*[2]] Regional
Medical Center in April 2010, [McNeely] was told she '[could]
resume full-time employment,'" and that "the [plaintiff] was
released to return to full time employment in April 2010 after a
psychiatric hospitalization."  R. at 22.

The ALJ also considered, and discounted, the opinions
of Dr. Stultz and Ms. Perry.  The ALJ acknowledged that Dr.
Stultz had been McNeely's "current treating psychiatrist[] for
about six months."  R. at 21.  But he nevertheless accorded
"little weight" to Dr. Stultz's opinion that McNeely "would have
moderate-to-extreme limitations in occupational, performance[,]
and personal abilities," reasoning that her opinion "fail[ed] to
provide a diagnosis or justification for [the] limitations" and
was "not support[ed] . . . with any form of testing[.]"  R. at
22.  The ALJ also assigned "little weight" to Ms. Perry's August
2010 opinion because he observed that Perry "is not a medical
doctor," and because the opinion did "not provide any function
limitations."  R. at 22-23.

---

[2] McNeely was treated at the New Hanover Regional Medical Center
in Wilmington, North Carolina, between April 3, 2010 and April
20, 2010.

Finally, based on his assessment of McNeely's RFC and the testimony of Ms. Salyers, the vocational expert, the ALJ found, at step four and step five, that McNeely was not capable of performing any past relevant work, but was capable of "making a successful adjustment to other work that exists in significant numbers in the national economy."[3]  R. at 23-24.  As a result, he concluded that McNeely was not disabled.  R. at 24.

## II. Standard of Review

The court must determine whether the ALJ's decision is based upon an appropriate application of the law and is supported by substantial evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted).  It "consists of more than a mere scintilla of evidence but may be less than a preponderance."  Smith v. Chater, 99 F.3d 635, 638

---

[3] However, it is noted that when Ms. Salyers was asked whether there were any jobs in the economy that could  be performed by one such as the plaintiff if the limitations of the "medical source statements" provided by Dr. Stultz were given great weight, she answered, "No, sir."  R. at 38-40.

(4th Cir. 1996). "In reviewing for substantial evidence, we do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ.]" Id. (internal quotation marks and citations omitted). As a result, if the court finds that substantial evidence supports the ALJ's finding, the decision must be affirmed even if the court disagrees with the outcome. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

## III. Discussion

McNeely contends that the ALJ's decision should be reversed because: (1) "The ALJ failed to comply with 20 C.F.R. § 404.1527 in his assessment and ultimate rejection of the opinion of [McNeely's] mental health provider, Dr. Stultz"; (2) "The ALJ committed reversible error in according 'little weight' to the opinion of [McNeely's] treating mental health therapist, licensed social worker, Joyce B. Perry"; and (3) "The substantial evidence of record documents that the claimant is

disabled and unable to perform the basic mental demands of
unskilled work".

A. The ALJ's Assessment of Dr. Stultz's Opinion

McNeely contends that the opinion of her treating
psychiatrist, Dr. Stultz, is "well-supported by medically
accepted clinical and laboratory diagnostic techniques [, . . .]
is in accord with the weight of the evidence on the whole," and
is therefore "entitled to controlling weight."  She argues that
the ALJ failed to properly weigh the value of that opinion
according to the framework set forth in 20 C.F.R. § 404.1527.
Plaintiff's Brief in Support of Judgment on the Pleadings
("Pl.'s Br.") at 2, 6.

Magistrate Judge Tinsley agreed, observing that "[t]he
ALJ did not" consider the "length, consistency, supportability,
specialization[,] and extent of Dr. Stultz's opinion," and, as a
result, "failed to give adequate weight" to that opinion.  PF&R
at 18.  He recommends reversal and remand on that basis.  In her
objections to the PF&R, the Commissioner maintains that the
ALJ's decision to give Dr. Stultz's assessment little weight is
supported by substantial evidence in the record, and asserts

that the ALJ complied with the requirements of 20 C.F.R. §
404.1527.  Defendant's Objections to the Magistrate Judge's
Proposed Findings and Recommendation ("Def.'s Obj.") at 2-3.

### 1. The Treating Physician Rule

An ALJ must generally give more weight to the medical
opinions of a claimant's treating physician when determining
whether a claimant is disabled.  20 C.F.R. §§ 404.1527(c)(2),
416.927(c); Russell v. Comm'r of Soc. Sec., 440 F. App'x 163,
164 (4th Cir. 2011).  Indeed, such opinions concerning the
"nature and severity" of a claimant's impairments are to be
given "controlling weight" if they are "well-supported by
medically acceptable clinical and laboratory diagnostic
techniques and [] not inconsistent with the other substantial
evidence in [the claimant's] case record[.]"  20 C.F.R. §
416.927(c)(2).

Even if a treating physician's opinion is ultimately
adjudged not to be entitled to controlling weight, our court of
appeals has explained, and the magistrate judge observed, that
"the value of the opinion must be weighed and the ALJ must
consider: (1) the physician's length of treatment of the

claimant, (2) the physician's frequency of examination, (3) the nature and extent of the treatment relationship, (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole[,] and (6) the specialization of the treating physician. <u>Burch v. Apfel</u>, 9 F. App'x 255, 259-60 (4th Cir. 2001) (citing 20 C.F.R. § 404.1527).  In any event, the ALJ must provide "good reasons" for the weight given to a treating physician's opinion. 20 C.F.R. § 416.927(c)(2).

### 2. The ALJ's Application of the Rule

In this case, the ALJ determined that the opinion of the plaintiff's treating physician, Dr. Stultz, was entitled to only "little weight."  R. at 22.  As the ALJ explained:

> The claimant presented to Stultz Sleep and Behavioral Health in April 2011 stating she was impulsively picking at her skin stating, "I'm nervous . . . I have a lot of anxiety[.]"  She also reported she had been out of medication for four days, which could have led to her increased symptoms.  On examination by Dr. Stultz in May 2011, the claimant's mood was "not good"; she had a constricted affect.  Dr. Stultz noted the claimant was in a vegetative state with decreased sleep, increased appetite and energy,[4] decreased

---

[4] Dr. Stultz's notes actually state that McNeely had decreased, rather than increased, energy in May 2011, as indicated by the handwritten notation: "↓ energy".  R. at 367.

> memory, increased tearfulness, and she was suspicious.
> However, Dr. Stultz did not support her statement with
> any form of testing; she only made these statements
> based on the claimant's allegations and perceived
> presentation. Even so, Dr. Stultz opined the claimant
> would have moderate-to-extreme limitations in
> occupational, performance[,] and personal abilities.
> However, Dr. Stultz'[s] notations indicate these
> limitations are based on the claimant's allegations of
> panic attacks and anxiety. Dr. Stultz also fails to
> provide a diagnosis or justification for her
> limitations. Therefore, her assessment is given
> little weight.

R. at 22. From this it appears -- though it is not clear --

that the ALJ determined that Dr. Stultz's opinions, including

the "Mental Assessment of Ability to do Work-Related Activities"

form submitted on August 1, 2011 were not "well-supported by

medically acceptable clinical and laboratory diagnostic

techniques," and therefore not entitled to controlling weight.

It is true, for example, that the assessment form includes no

description of any "medical/clinical findings that support" the

assessment, R. at 379-80 (providing no response to three

questions asking for descriptions of the medical or clinical

findings), and the treatment records submitted by Dr. Stultz

appear to consist primarily of a medical history and notes on

the plaintiff's description of her then-current condition, as

opposed to the results of any testing, R. at 368-70.

But even assuming that the ALJ was correct not to accord Dr. Stultz's opinion controlling weight, he was still required to weigh the factors listed in 20 C.F.R. § 404.1527(c)(2) before deciding to assign her assessment "little weight."  The ultimate test is not whether the ALJ mechanically recited each factor, but whether it is clear from the decision that all of the pertinent factors were considered.  See Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007); Halloran v. Barnhart, 362 F.3d 28, 32-33 (2d Cir. 2004) (deducing, "[a]fter carefully considering the entire record and the ALJ's opinion," that "the ALJ applied the substance of the treating physician rule."); Botta v. Barnhart, 475 F. Supp. 2d 174, 188 (E.D.N.Y. 2007) ("Although the ALJ should 'comprehensively' set forth the reasons for the weight assigned to a treating physician's opinion, the failure to do so does not require remand if it can be ascertained from the entire record and the ALJ's opinion that the ALJ 'applied the substance' of the treating physician rule." (internal citations omitted)); see also Burch, 9 F. App'x at 259-60 (parsing the ALJ's order and concluding that the discussion therein "indicate[d] consideration of all the pertinent factors"); Tucker v. Astrue, 897 F. Supp. 2d 448, 468 (S.D. W. Va. 2012) ("Simply stated, the adequacy of the written

discussion is measured by its clarity to subsequent
reviewers.").

     The ALJ's decision indicates that not all of the
pertinent factors were considered.  The ALJ did note that Dr.
Stultz had been the plaintiff's "treating psychiatrist[] for
about six months," and further observed that Dr. Stultz treated
the plaintiff "once a month."  R. at 21.  From this it appears
that the ALJ considered the length, frequency, and extent of the
plaintiff's treatment relationship with Dr. Stultz, as well as
Dr. Stultz's status as a psychiatric specialist.  The ALJ also
stated that Dr. Stultz's opinion was "not support[ed] . . . with
any form of testing," R. at 22, which indicates that the ALJ
considered the extent to which the opinion was supported by
medical evidence of that variety.  Indeed, as discussed above,
Dr. Stultz's assessment was silent with respect to the
"medical/clinical findings that support[ed]" it.

     Nevertheless, the remaining factor -- the consistency
of the opinion with the record as a whole -- was not explicitly
analyzed by the ALJ, and it is unclear from his decision whether
he did in fact measure Dr. Stultz's opinion against the entire
record.  To be sure, the ALJ did describe certain aspects of the
medical evidence in the record.  He noted, for example, that,

despite being hospitalized on prior occasions, the plaintiff had previously been cleared to return to work, and "repeatedly advised her doctor at Valley Health System that she wanted to go back to work."[5] R. at 22.  The ALJ referenced reports from the State's medical consultants that indicated that McNeely's mental impairment "had not lasted long enough to make a determination of her ability to work," but neglected to note that those same consultants not only found her impairments of affective disorder and personality disorder to be severe but rendered their opinions on the basis of their 2010 review of the records. Thus, they did not consider Dr. Stultz's treatment in 2011 which may have affected their opinion that those severe impairments were not expected to last for twelve months.

The ALJ also made the dubious observations that the

---

[5] The ALJ was presumably referring to Dr. April Baisden, who treated McNeely from January 2010 through June 2010 at Valley Health.  Based on the limited and highly selective discussion of Dr. Baisden's treatment records, it appears that the ALJ did not consider them to constitute the medical opinion of a treating physician, and as a result did not analyze them under the framework set out in 20 C.F.R. § 404.1527.  The Commissioner apparently agrees with this assessment, and urges that Dr. Baisden's records should not be treated as the potentially controlling opinion of a treating physician.  See Def.'s Obj. at 3 ("Dr[.] Baisden . . . . did not submit medical opinions that triggered a § 404.1527 evaluation; rather [she] submitted treatment records, which the ALJ appropriately made 'findings about what the evidence shows[.]'" (citing 20 C.F.R. § 404.1520b)).

plaintiff's symptoms appeared to be adequately controlled during the four month period immediately prior to her visit with Dr. Stultz in April 2011; and that the plaintiff "had been out of medication for four days" prior to her initial visit in April 2011 with Dr. Stultz, opining that this "could have led to her increased symptoms."  R. at 22.

The ALJ did not draw any direct comparisons between these aspects of the record and Dr. Stultz's opinion regarding the plaintiff's limitations, nor did he specifically identify any inconsistencies between the two.  Yet, 20 C.F.R. § 404.1527 instructs an ALJ to consider whether a treating physician's opinion is consistent "with the record as a whole," rather than just selected elements of it.  The entire record in this case suggests McNeely has experienced cycles of serious mental health distress punctuated by severe episodes of decompensation, recognized by the ALJ to have been one or two but by the State consultants as three.  And, when viewed in its entirety, the record could also be read to suggest that McNeely's symptoms and behavior were becoming worse, not better, over time, and that she was becoming increasingly unable to cope with the employment environment.  For example, while the ALJ noted that McNeely appeared to respond to medication and returned to work at

various points, he did not specifically discuss the fact that
McNeely was involuntarily admitted to Riverpark Hospital in
Huntington, West Virginia, for five days in July 2010 after
making "a verbal comment about wanting to kill her ex-boss." R.
at 282. Although McNeely later indicated that she "was never
serious when she made this comment," id. at 282-83, the ALJ also
failed to discuss the fact that McNeely ultimately resigned from
her job after threatening to "get a gun [and] shoot" a coworker,
id. at 375. Similarly, the ALJ referred generally to "records
from Valley Health Systems [that] show [McNeely] repeatedly
wanted to return to work," but he declined to discuss the fact
that McNeely's employer wrote to Dr. Baisden (the plaintiff's
treating physician at Valley Health Systems) in June 2010 in
response to concerns over the plaintiff's threatening behavior.
In response, Dr. Baisden wrote that she was "unwilling at [that]
point to state with certainty that [McNeely] could not be a risk
to herself or . . . to someone else[.]" Id. at 373-74.

      In sum, the ALJ suggested (albeit without ever saying
so directly) that Dr. Stultz's opinion was inconsistent with
certain evidence in the record which showed that McNeely's
symptoms were less than severe or adequately controlled. But
the ALJ did not discuss other evidence in the record that shows

28

that McNeely's behavior and symptoms were becoming increasingly worse over time. 20 C.F.R. § 404.1527(c)(4). Although it is certainly true, as the ALJ noted, that McNeely appeared to recover and express a desire to work at various times, the record also shows that the plaintiff's erratic behavior towards her coworkers was escalating in June and July of 2010. As a result, it is possible to interpret Dr. Stultz's opinion that McNeely was suffering from "moderate-to-extreme limitations" in April and May of 2011 as consistent with the long-term trajectory of McNeely's symptoms and behavior, which were becoming more severe towards the end of the period documented in the record. But because the ALJ did not specifically discuss these aspects of the record, it is simply impossible to determine whether, or to what extent, he weighed that evidence against Dr. Stultz's opinion. Such a selective analysis of the record evidence does not comply with § 404.1527's directive to weigh a treating physician's opinion against the record "as a whole," and the court therefore cannot conclude that the ALJ considered all of the pertinent factors. Accordingly, remand is appropriate.[6]

---

[6] The fact that the ALJ may ultimately conclude that Dr. Stultz's opinion is inconsistent with the entire record, properly considered, does not militate against remand. As the Sixth Circuit has explained:

B. The ALJ's Assessment of Ms. Perry's Opinion


Because the magistrate judge recommended that the ALJ's decision be reversed for failing to properly weigh the value of Dr. Stultz's opinion according to the factors identified in 20 C.F.R. § 404.1527, the PF&R did "not address [the] additional argument[] that the ALJ committed reversible error in according little weight to the opinion of [plaintiff's] licensed social worker[.]"  PF&R at 18.

The plaintiff argues that "[t]he ALJ committed reversible error in according 'little weight' to the opinion of [her] treating mental health therapist, licensed social worker, Joyce B. Perry" by failing to weigh her opinion in the manner prescribed by 20 C.F.R. § 404.1513(d) and Social Security

---

A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely.  [A] procedural error is not made harmless simply because [the aggrieved party] appears to have had little chance of success on the merits anyway.  To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with § 1527(d), would afford the Commissioner the ability to violate the regulation with impunity and render the protections promised therein illusory.
Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 546 (6th Cir. 2004) (internal quotation marks and citations omitted).

Regulation 06-03p.  The court agrees, and that failure provides
an additional basis for remand in this case.

     An ALJ must consider all evidence from "acceptable
medical sources" including licensed physicians and other
providers. 20 C.F.R. § 404.1513(a).  In addition, the Social
Security Administration has explained that opinions from
"[m]edical sources who are not considered 'acceptable medical
sources,' such as . . . licensed clinical social workers . . . .
are important and should be evaluated on key issues such as
impairment severity and functional effects[.]"  See Considering
Opinions & Other Evidence from Sources Who Are Not "Acceptable
Medical Sources" in Disability Claims, SSR 06-03p, 71 Fed. Reg.
45593, 45593-94 (Aug. 9, 2006).

     When weighing the opinions of "other medical sources,"
the same factors used to assess the value of a treating
physician's opinion are applicable.  Id. at 45595 ("Although the
factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply
only to the evaluation of medical opinions from 'acceptable
medical sources,' these same factors can be applied to opinion
evidence from 'other sources.'").  As a result, courts have held
that, "[i]n deciding how much weight to give to opinions from
these 'other medical sources,' an ALJ should apply the same

criteria listed in § 404.1527." <u>Phillips v. Astrue</u>, 413 F. App'x 878, 884 (7th Cir. 2010); <u>Cruse v. Comm'r of Soc. Sec.</u>, 502 F.3d 532, 541 (6th Cir. 2007); <u>see also</u> <u>Foster v. Astrue</u>, 826 F. Supp. 2d 884, 886-87 (E.D.N.C. 2011) (reversing and remanding ALJ's decision for failure to fully explain reasons for rejecting the opinion of claimant's treating clinical social worker); <u>Martin v. Barnhart</u>, 470 F. Supp. 2d 1324, 1329 (D. Utah 2006) ("Following the SSR 06-03P regulation, the ALJ should have discussed factors relating to the Nurse Practitioner's opinion or, at the least, should have discussed Nurse Mol's evidence so that the [c]ourt could have followed the ALJ's reasoning. Thus, the [c]ourt determines that it was error for the ALJ to disregard the nurse practitioner's opinion without first discussing the evidence he was rejecting.").

"Not every factor for weighing opinion evidence will apply in every case[, and the] evaluation of an opinion from a medical source who is not an 'acceptable medical source' [necessarily] depends on the particular facts in each case." <u>SSR 06-03p</u>, 71 Fed. Reg. at 45595-96. Where the ALJ, at a minimum, discusses the opinion and its consistency with the record, courts will generally accept the ALJ's ultimate evaluation of its proper weight. <u>See, e.g.</u>, <u>Little v. Colvin</u>,

997 F. Supp. 2d 45, 52-53 (D.D.C. 2013) (noting that ALJ was not required to explicitly consider all six factors and upholding decision where ALJ noted social worker's specialization and discussed consistency of social worker's opinion with record evidence); Chaffin v. Colvin, 999 F. Supp. 2d 468, 475-76 (W.D.N.Y. 2014) (holding that ALJ properly evaluated the opinion from social worker where he evaluated whether the source had a treating or examining relationship with the plaintiff and whether the medical opinions were consistent with the other evidence). On the other hand, in cases where the ALJ simply discounts the opinion because it is not from an acceptable medical source, but otherwise fails to explain his reasoning, courts will remand the decision for further explanation. See, e.g. Taylor v. Astrue, 899 F. Supp. 2d 83, 89 (D. Mass. 2012) (remanding where ALJ noted that registered nurse was not an acceptable medical source, but otherwise failed to adequately explain the weight that was given to a nurse's opinion); Hernandez v. Astrue, 814 F. Supp. 2d 168, 188 (E.D.N.Y. 2011) (remanding where "ALJ's decision lack[ed] any discussion of which factors, if any, the ALJ considered when deciding to afford more weight to" certain medical opinions, "as opposed to opinions from plaintiff's other mental health providers, including social workers."); Canales v. Comm'r of Soc. Sec., 698

33

F. Supp. 2d 335, 344 (E.D.N.Y. 2010) ("While the ALJ was free to conclude that the opinion of a licensed social worker was not entitled to any weight, the ALJ had to explain that decision. The ALJ disregarded Rodriguez's opinion simply because it was the opinion of a social worker, not on account of its content or whether it conformed with the other evidence in the record."); see also Foster, 826 F. Supp. 2d at 886-87 (same).

In this case, McNeely was treated by Ms. Perry, a licensed social worker and licensed professional counselor, on a regular basis from July 2009 until at least August 2010. R. at 300-14. As noted above, Ms. Perry's treatment notes provide a detailed longitudinal overview of McNeely's mood and symptoms. On August 2, 2010, Ms. Perry completed a mental health assessment in which she indicated that McNeely was, by that time, experiencing moderate auditory hallucinations and suicidal ideation, possessed of moderately deficient judgment and insight, and suffering from depressed mood. R. at 300. Ms. Perry rated McNeely's immediate memory as moderately deficient; her recent memory as severely deficient; her concentration and pace as moderately deficient; and her task persistence and social functioning as mildly deficient. R. at 301. She further observed that McNeely's "concentration, social interaction,

34

memory, and adaptation to a work environment seem[ed] very impaired, based on recent interviews/sessions." Id.

The ALJ accorded Ms. Perry's opinion "little weight" because it was not from an acceptable medical source, and did "not provide any function limitations." R. at 22-23. The ALJ did not specifically discuss any of the factors listed in 20 C.F.R. § 404.1527, and it is unclear to what extent he considered them. Based on the statement that Ms. Perry was not an acceptable medical source, it appears that the ALJ did consider Ms. Perry's specialization. However, the decision provides no indication that the ALJ considered the length, nature, and extent of Ms. Perry's treatment relationship with McNeely (which were extensive), or the extent to which Ms. Perry's opinion was supported by or consistent with medical evidence in the record as a whole. In fact, the ALJ's limited discussion of Ms. Perry's opinion appears at times inconsistent. For example, the ALJ stated that Ms. Perry's opinion provided no "function limitations," but it appears that Ms. Perry did opine in some detail concerning the limits of McNeely's memory, concentration, pace, task persistence, and social functioning. It is simply unclear how the ALJ analyzed and weighed those assessments.

Even so, the Commissioner argues that any failure on the ALJ's part to analyze Ms. Perry's opinion based on the relevant factors is, at worst, harmless error and provides no basis for remand.  Specifically, she argues that the "ALJ adequately accounted for memory, concentration, pace, and social functioning difficulties by limiting [McNeely] to work that involved only low stress, occasional decisionmaking, occasional work-setting changes, no public interaction, and only occasional co-worker interaction."  It appears that the ALJ noted McNeely's moderate difficulties with social functioning, concentration, persistence, and pace, and incorporated those limitations into the RFC.  R. at 20 ("The following residual functional capacity assessment reflects the degree of limitation the undersigned has found[,]" including McNeely's moderate limitations described above.).  However, it does not appear that the ALJ considered McNeely's immediate memory to be "severely deficient" in formulating the RFC.

Accordingly, given that the ALJ's decision provides scant insight into his reasons for assigning Ms. Perry's opinion "little weight," remand is appropriate.

IV. Conclusion

For the reasons stated, and having reviewed the record de novo, the court ORDERS as follows:

1. That the PF&R be, and it hereby is, adopted together with the additional ground for remand relating to the findings and opinion of Ms. Perry;

2. That the Commissioner's final decision be, and it hereby is, reversed and remanded for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g);

3. That the Commissioner be, and hereby is, directed to consider on remand the weight to be accorded the opinion of Dr. Stultz and Ms. Perry, taking account of all relevant factors; and

4. That this action be, and it hereby is, dismissed and stricken from the docket.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record and the United States Magistrate Judge.

DATED: September 30, 2014

John T. Copenhaver, Jr.
United States District Judge

37